1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10    MICHAEL LENIOR SMITH,

11              Plaintiff,                    No. CIV S-05-1257 GEB KJN (TEMP) P

12        vs.

13    STATE OF CALIFORNIA, et al.,

14              Defendants.         FINDINGS AND RECOMMENDATIONS

15    _____/

16              Plaintiff is a California prisoner proceeding without counsel with an action for

17    violation of civil rights under 42 U.S.C. § 1983.  The only remaining defendant, defendant

18    Runnels (defendant), is an employee of the California Department of Corrections and

19    Rehabilitation ("CDCR").  Two claims remain: one for denial of equal protection of the laws in

20    violation of the Fourteenth Amendment; and an Eighth Amendment claim.  Both claims concern

21    the alleged denial of outdoor exercise.  The Eighth Amendment claim concerns denial of outdoor

22    exercise between: 1) December 26, 2003, and March 2004; and 2) January 27, 2005, and June

23    2005.  Defendant has filed a motion for summary judgment with respect to plaintiff's Eighth

24    Amendment claim in which he argues that he is immune from suit under the doctrine of

25    ////

26    ////

1

1  "qualified immunity."[1]  Defendant previously filed a motion for summary judgment and a

2  decision was issued with respect to that motion on January 16, 2009.  In an order dated May 27,

3  2010, defendant was granted leave to file a second motion for summary judgment in light of

4  Norwood v. Vance, 591 F.3d 1062, 1068 (9th Cir. 2010).

5  I.  Summary Judgment Standard

6          Summary judgment is appropriate when it is demonstrated that there exists "no

7  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

8  matter of law."  Fed. R. Civ. P. 56(c).

9              Under summary judgment practice, the moving party always bears
               the initial responsibility of informing the district court of the basis
10             for its motion, and identifying those portions of "the pleadings,
               depositions, answers to interrogatories, and admissions on file,
11             together with the affidavits, if any," which it believes demonstrate
               the absence of a genuine issue of material fact.

12

13  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c).  "[W]here the

14  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

15  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

16  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

17  after adequate time for discovery and upon motion, against a party who fails to make a showing

18  sufficient to establish the existence of an element essential to that party's case, and on which that

19  party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

20  concerning an essential element of the nonmoving party's case necessarily renders all other facts

21  immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

22  whatever is before the district court demonstrates that the standard for entry of summary

23  judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

24

25          [1] Plaintiff has filed an opposition to defendant's motion, defendant filed a reply and then
    plaintiff filed a sur-reply.  Sur-replies are generally not permitted.  See Local Rule 230(*l*).
26  Because plaintiff did not obtain permission to file a sur-reply, it will not be considered.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

1   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

2   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

3   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

4   show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

5   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

6   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

7          On November 16, 2006, the court advised plaintiff of the requirements for

8   opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v.

9   Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and

10  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

11  II.  Qualified Immunity Within The Context Of An Eighth Amendment Claim For Alleged

12  Denial Of Outdoor Exercise

13         Government officials performing discretionary functions generally are shielded

14  from liability for civil damages insofar as their conduct does not violate clearly established

15  statutory or constitutional rights of which a reasonable person would have known.  Harlow v.

16  Fitzgerald, 457 U.S. 800, 818 (1982).  In determining whether a governmental officer is immune

17  from suit based on the doctrine of qualified immunity, the court must answer two questions.  The

18  first question is, do the facts alleged show the officer's conduct violated a constitutional right?

19  Saucier v. Katz, 533 U.S. 194, 201 (2001).  The second question is "whether the right was clearly

20  established."  Id.  "If the law did not put the [defendant] on notice that [his] conduct would be

21  clearly unlawful, summary judgment based on qualified immunity is appropriate."  Id. at 202.

22  Put another way, a correctional officer is entitled to immunity unless it would be clear to a

23  reasonable officer that denying outdoor exercise was unlawful in the situation he confronted.

24  Norwood, 591 F.3d at 1068.

25         In Norwood, the Ninth Circuit addressed when a correctional officer is entitled to

26  immunity from an Eighth Amendment claim for denial of outdoor exercise based on "qualified

4

immunity." First, the court acknowledged that, pursuant to their decision in <u>Allen v. Sakai</u>, 48 F.3d 1082, 1088 (9th Cir. 1995), there is a Constitutional right to outdoor exercise which may not be denied for inconsequential logistical concerns, <u>Norwood</u>, 591 F.3d at 1069, or punitive reasons, <u>id</u>. at 1070.  However, the court found that there is no clearly established right to outdoor exercise in "in the midst of severe ongoing prison violence" <u>id</u>. at 1068, and temporary restrictions on outdoor exercise are lawful to help bring violence under control.  <u>Id</u>. at 1069.  The court based this finding, in part, on the clearly established premise that prison officials have a duty to assure their prisons are safe, <u>id</u>. at 1069, and they must balance this imperative against other obligations such as providing outdoor exercise.  <u>Id</u>.  Whatever measures are taken to halt violence are lawful as long as prison officials reasonably believe the measures would be effective in stopping violence, and erring on the side of caution by maintaining a prison lockdown longer than necessary is considered a "virtue."  <u>Id</u>.

The Ninth Circuit described the situation confronted by the defendants in <u>Norwood</u>, where at least one prisoner had died and persons had been severely wounded, as "extraordinary violence gripping the prison threatening staff and inmates alike."  <u>Id</u>. at 1068-69.  The court also noted that there was a "serious risk that gangs would press unaffiliated inmates like Norwood into service."  <u>Id</u>. at 1068.  Ultimately, the Court decided the defendants in <u>Norwood</u> were entitled to summary judgment based on qualified immunity.  <u>Id</u>. at 1070.

III.  <u>December 26, 2003, Through March 2004</u>

In his amended complaint, which is verified, plaintiff alleges:

> On December 26th, 2003, the entire black inmate population was placed on lockdown status due to alleged information being received by High Desert State Prison, that black inmates were conspiring to assault staff.  This racial lockdown called for no recreational periods . . . and lasted until March of 2004 . . .

Am. Complt. at 2.  Plaintiff asserts that on March 24, 2005, he was transferred from "B-Facility" at HDSP to "D-Facility."  <u>Id</u>.  The court assumes that plaintiff was housed in B-Facility between December 2003 and March 2004.

1        In his declaration, defendant asserts as follows:

2        1.   At all times relevant to this case, defendant was the Warden at High Desert

3   State Prison ("HDSP").  Def.'s Decl., ¶¶ 31-42.

4        2.   When institutional security is threatened, a lockdown may be necessary to

5   investigate, assess, and eliminate the danger.  Often, lockdowns are necessary when correctional

6   staff members discover evidence that violence is being planned against inmates or staff.  Staff

7   takes all violence seriously, but there is a greater concern if there is evidence the attacks may be

8   part of a greater scheme because it could lead to a riotous situation.  Id. at ¶ 9.

9        3.   Throughout each lockdown, the Warden, Chief Deputy Warden, Associate

10  Wardens, Facility Captains, the Correctional Captain, and representatives from the Investigative

11  Services Unit and the institutional gang investigator typically meet five times each week to

12  discuss the status of the lockdown, including the process of the investigations and analyze the

13  gathered information and intelligence.  The purpose for these meetings was to continuously

14  reevaluate all of the lockdown conditions in an effort to return to normal operations as quickly

15  and safely as possible.  During the meeting, everyone reported on the status of the lockdown,

16  investigations, and unlock process.  Based upon this information, we discussed the level of

17  danger at the prison and whether any changes to the status of the lockdown, investigation, or

18  unlock were appropriate.  Id. at ¶ 11.

19       4.   The lockdown investigation process is slow, time-consuming, and labor

20  intensive.  Staff must interview inmates, often more than once because prisoners are reluctant to

21  speak with or disclose information to correctional staff members.  The yards, all cells, common

22  areas, and other areas of the prison are searched thoroughly for evidence, weapons and

23  contraband.  Mail is screened for any information concerning planned violence.  Each piece of

24  evidence and information obtained from either a search or interview are examined and all leads

25  are followed, which often creates the need for additional searches and interviews.  Id. at ¶ 18.

26  ////

5. Among all of the normal programming activities that are suspended during a lockdown, it is most difficult to determine when exercise programs can safely be resumed. Inmates have the greatest access to each other on the exercise yards, which is typically where most assaults occur. Self-imposed ethnic divisions are especially pronounced on the exercise yards because the various ethnic groups often claim areas of the yard as their turf. During normal programming, the number of inmates on a yard greatly outnumbers the correctional staff assigned to monitor the area. Id. at ¶ 23.

6. It is more difficult, labor intensive, and expensive to operate a prison during a lockdown. Typically, inmates are fed together in the dining halls, assist staff during work assignments, and can report to the showers and some medical appointments without an escort. During a lockdown, correctional staff members must deliver all meals to each inmate's cell, most work assignments are suspended, and inmates must be escorted to showers and medical appointment. Id. at ¶ 32.

7. On December 29, 2003,information was received of possible staff assaults being planned at HDSP. B Facility staff discovered anonymous notes indicating that African-American inmates intended to assault staff with weapons. Later, B Facility staff discovered information that African-American inmates associated with the Crips disruptive group also intended to assault staff. Based upon the significant and credible threats of continued violence against staff, by several disruptive groups, all 508 African-American inmates in B Facility were locked down, pending investigations, interviews, and searches to assess the threat. Id. at ¶ 36(e).

8. Between January 5 and April 6, 2004, the entire prison was searched, and inmates and staff in B Facility were interviewed. The prison investigative services unit ("ISU") gathered intelligence from various sources. During the interview process, many inmates refused to talk for fear of retaliation by other inmates, and this slowed information gathering. However, there was a very serious a viable threat to staff safety that had to be fully investigated. Because HDSP could not ascertain the nature of the threat until the investigation was completed, it was

1  not safe to unlock to begin the process of restoring yard privileges.  Id. at ¶ 36(f).

2          9.  On April 6, 2004, the African-American population began an incremental

3  unlock process, which was completed on April 22, 2004.  During the phased unlock, there were

4  incidents of violence involving African-Americans.  While these later proved to be isolated

5  incidents, HDSP efforts to evaluate and assess the potential threat delayed the unlock process.

6  Id. at ¶ 36(g).

7          10.  By April 22, 2004, all African-American inmates at HDSP were returned to

8  normal programming.  Id. at ¶ 36(h).

9          The court has reviewed the evidence submitted by plaintiff herein, including his

10  declaration.  None of the evidence provided by plaintiff contradicts in any meaningful way the

11  evidence provided by defendant described above.  Plaintiff asserts in paragraph 16 of his

12  declaration:  "It is common knowledge that many lock-downs are 'staged', 'fraudulent' and

13  "invented" by HDSP Staff for years."  But plaintiff fails to provide any such evidence or even

14  point to anything supporting how inmates have come to know this alleged fact.  Plaintiff also

15  implies in his declaration that prison officials prefer to have inmates on lockdown because

16  lockdowns require less staff.  Pl.'s Decl. at ¶ 28.  Again, plaintiff fails to indicate how he knows

17  this alleged fact.

18          After reviewing all of the evidence before the court, the court finds that defendant

19  is immune from suit under the doctrine of qualified immunity with respect to plaintiff's claim

20  that he was denied exercise between December 2003 and March 2004, an alleged violation of the

21  Eighth Amendment.  The evidence before the court does not establish that defendant had any

22  objective reason to believe that by locking down B Facility between that period of time he would

23  be subjected to liability under the Eighth Amendment.  As indicated above, defendant has a duty

24  to balance inmates' right to outdoor exercise against his responsibility to keep all in the prison

25  safe.  The evidence before the court shows that defendant was made aware of threats to staff, he

26  proceeded to attempt to locate the threat, isolate the threat, and then return the prison to normal

programming.  While is it not entirely clear that these tasks could not have been accomplished in

less than four months, it is clear that, under Norwood, the court must give deference to prison

officials when making decisions regarding the safety of their prisons and allow them leeway to

err on the side of caution to maintain institutional security.  Furthermore, there is nothing

admissible before the court indicating, as plaintiff suggests, that the lockdown imposed was

meant to be punitive, or somehow in bad faith.   For all of these reasons, the court will

recommend that defendant be granted summary judgment with respect to plaintiff's Eighth

Amendment claim based on denial of exercise between December 2003 and March 2004.

IV.  January 27, 2005,and June 2005

In his amended complaint, plaintiff alleges:

> On January 27th, 2005, through June of 2005, plaintiff was again placed on a race based lockdown and denied any and all recreation being locked in his cell for 24 hours per day and due to no fault of his own, accept [sic] that he is a member of the black race.

> On January 27, 2005 when plaintiff was placed on lockdown he was assigned to H.D.S.P. B-Facility.  On March 18th, 2005 petitioner was transferred from B-Facility to D-Facility.  On March 24, 2005 B-Facility was relieved of its lockdown status.  However, on D-Facility H.D.S.P. black inmates were alleged to have been conspiring to assault staff and were placed on lockdown status pending investigation. . . [D]ue to plaintiff being a member of the black race, plaintiff was kept on lockdown, with the entire black race on D-Facility. . .

> Plaintiff was transferred from D-Facility where black prisoners were being released from lockdown and placed back on B-Facility where black inmates were back on lockdown.  The transfer from D-Facility to B-Facility occurred on June 01st, 2005.

> On June 02nd, 2005 the black prisoners were to be released from lockdown status of which they were subjected to subsequent to plaintiff's transfer from B-Facility on March 18th, 2005 to D-Facility.  However, and on the morning of the impending release, Correctional Officer "Shaver" appeared at plaintiff's assigned cell B-3 and ordered plaintiff to "cuff up."  Plaintiff complied and was transferred again from B-Facility to D-Facility H.D.S.P where black inmates were again on lockdown status.

> On or about June 21st, 2005 the black inmate population was being released from racial lockdowns five inmates per week of which

> lockdown plaintiff was not responsible for.  Once plaintiff was due
> to be released, plaintiff was transferred again from D-Facility to B-
> Facility, where the black population was again on lockdown status,
> subjecting plaintiff to further lockdowns.

Am. Complt. at 2-3.  Plaintiff asserts he remained on lockdown in "B-Facility" until June 29th

2005 when he was placed in "administrative segregation."  Id. at 3.

      Defendant asserts as follows in his declaration:

      1.  Defendant had no knowledge as to plaintiff's housing placement at HDSP and

played no role in his being given different housing assignments within the facility.  Def.'s Decl.,

¶¶ 29-31.

      2.  On January 27, 2005, all inmates at HDSP were placed on lockdown after:

(1) receipt of a threat regarding planned staff assaults; (2) discovery of contraband, including

inmate-manufactured weapons; and (3) several incidents of staff assaults by several different

inmate ethnic groups.  Based upon these facts, there was considerable evidence that inmates at

HDSP were armed and intended to assault staff.  However, staff did not know:  (1) whether these

were isolated threats or organized threats by prison disruptive groups; (2) which groups were

involved; (3) which inmates were planning the violence; and (4) what the nature of the threat

was.  Accordingly, all inmates at HDSP were placed on lockdown.  Id. at ¶36(k).

      3.  On February 4, 2005, information was received indicating that inmates

intended to assault staff in D Facility.  On March 23, 2005, a confidential source revealed that

African-American inmates were conspiring to assault staff in D Facility.  Shortly thereafter, a

second inmate indicated that African-American inmates were very upset with the staff because of

the searches and confiscation of contraband during the lockdowns.  Id. at ¶36(l).

      4.  Between February and March 2005, the entire prison was searched for weapons

and contraband and all of the inmates at HDSP were interviewed to assess the nature of the

threat.  The objective of the process was to identify the inmates planning to commit assaults,

////

remove them from the prison, and immediately restore normal programming to uninvolved
inmates.  Id. at ¶36(m).

5.  On April 2, 2005, B Facility staff received information from an African-
American inmate, indicating that several African-American inmates intended to assault staff
following the resumption of a normal program.  Based upon this information, a new series of
interviews and investigations were conducted to assess if the threat was credible, and to
determine the number and identities of the inmates involved.  During the interview process, a
second African-American inmate indicated African-American inmates were planning assaults on
staff following the resumption of normal programs.  Id. at ¶36(n).

6.  On April 26, 2005, HDSP completed the institution-wide search for weapons.
Furthermore, ISU determined that the information regarding African-American inmates' planned
assaults on staff provided during the interviews was not credible.  Accordingly, on April 28,
2005, the prison ordered an incremental release to the Facility B exercise yard, which started on
May 4, 2005.  Id. at ¶36(o).

7.  On the morning of May 4, 2005, two African-American inmates started, what
appeared to be, a fight on their way to the dining hall.  Staff responded to the commotion.  The
inmates did not stop fighting, but the fight appeared to be staged, as the combatants kept
bumping into each other and swinging and missing with punches that could have been connected.
In addition, another African-American inmate, who was a cellmate of one of the combative
inmates, was found to be in possession of two inmate-manufactured stabbing weapons, and he
was standing immediately adjacent to the incident site.  As staff was escorting the remaining
African-American inmates back to their cells, an African-American inmate retrieved an inmate-
manufactured weapon from his rectum and assaulted an officer.  Another inmate manufactured
weapon was discovered near the assault.  Based upon these circumstances, correctional staff
believed the initial incident was a staged fight as part of a plan involving several African-
American inmates designed to assault staff.  Id. at ¶36(p).

8.  All African-American inmates were placed back on lockdown on May 5, 2005, pending an investigation regarding the incident, which included interviews with all of the African-American inmates in B Facility and searches for weapons.  The other inmates at HDSP resumed an incremental release.  The investigation by ISU revealed that the fight between the two inmates was legitimate and based upon a personal issue.  Accordingly, an incremental unlock was ordered for all African-American inmates on May 19, 2005, and all inmates returned to normal program on May 26, 2005.  Id. at ¶36(r).

9.  On May 23, 2005, three African-American representatives indicated it would be too dangerous to resume a normal program for African-American inmates, because so many were planning violence against staff.  Because the representatives would not provide the identity of the specific inmates planning assaults, the prison could not remove those individuals planning the violence in order to resume normal programming.  The representatives requested that they be permitted to continue communicating with the African-American inmate population, because they could assess and help resolve the threat against staff.  In addition, staff continued to investigate the threat in order to identify and remove any inmates who posed a threat to staff or inmates.  Id. at ¶36(s).

10.  On June 9, 2005, the African-American representatives first indicated that it might be safe to release the African-American population from lockdown.  The representatives stated the African-American inmates were no longer a threat to launch a coordinated assault against staff, but they could not rule out individual inmates attempting to assault staff based upon the information they had gathered.  Based upon this information and the information gathered by the continuous efforts of ISU, an unlock plan was prepared, and prison began to unlock on June 20, 2005.  Id. at ¶36(t).

The only evidence or argument presented by plaintiff worthy of comment herein is his suggestion that defendant somehow targeted plaintiff for lockdown by transferring him to different locations within HDSP to make sure plaintiff would remain on lockdown.  However, as

indicated above, defendant has established that he was not responsible for plaintiff being

transferred within HDSP, nor did he have any particular knowledge as to where plaintiff was

housed.  Plaintiff fails to point to any admissible evidence to the contrary.  Rather, plaintiff

argues that any violations of law resulting from plaintiff being transferred within HDSP are

attributable to defendant because he was the warden of that facility at the relevant time.

However, vicarious liability in not applicable in a § 1983 action and a defendant can only be held

liable for his own actions.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948 (2009).

Again, as concluded above, defendant is immune from suit under the doctrine of

qualified immunity.  The evidence before the court does not establish that defendant had any

objective reason to believe that by instituting the lockdown described above between January and

June of 2005 that he would be depriving inmates of rights guaranteed under the Eighth

Amendment.  Defendant is permitted to suspend outdoor exercise if he believes that doing so is

necessary to insure safety.  The evidence before the court establishes that is what happened here

and that exercise was not suspended in order to punish or in bad faith.

In accordance withe the above, IT IS HEREBY RECOMMENDED that:

1.  Defendant's motion for summary judgment (#95) be granted.

2.  Plaintiff's remaining Eighth Amendment claims against defendant Runnels be

dismissed.

3.  Plaintiff be ordered to file an amended pretrial statement concerning his

remaining equal protection claims within twenty-one days of any order adopting the foregoing

findings and recommendations, and defendant Runnels be ordered to file an amended pretrial

statement within twenty-one days of service of plaintiff's pretrial statement.

These findings and recommendations are submitted to the United States District

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

one days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

1  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

2  shall be served and filed within seven days after service of the objections.  The parties are

3  advised that failure to file objections within the specified time may waive the right to appeal the

4  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

5  DATED:  February 16, 2011

6

7

8  KENDALL J. NEWMAN
   UNITED STATES MAGISTRATE JUDGE

9  smit1257.57(3)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26